Next case is Abraxis Bioscience v. Mayne Pharma Somehow I thought this was AstraZeneca v. Wyeth, but it seems to have morphed. Mr. Weiss, when you're ready. Thank you, Your Honor. May it please the Court. The primary issue in this case front and center is claim construction. That's where I would like to begin. The district court's marking rule provided that editate meant compounds that were structurally related to EDTA, but did not further define what was meant by structurally related. The parties went to trial. AstraZeneca at the time's experts said that pentitate, DTPA, is structurally related because it has the same chemical groups, and because on a blackboard one can chop up two EDTA molecules and rearrange them into a DTPA molecule. What if we agree with you on that point? How would you interpret editate? Well, as we state in the brief, and this is what I think it is, editate, in light of the prosecution history, and in light of the definition of the specification, is EDTA and the salts or anions of EDTA. And derivatives. Derivatives? Well, that's what the specification says. Actually, derivatives is not part of the claim, is it? That's right, Your Honor, and that's where we think the district court went astray or was left astray. How do we go about interpreting a provision in the written description when that provision purports to be a definition but is ambiguous? What is the proper mechanism? I know we have a lot of stuff about how we interpret claim language, but we're not here interpreting claim language. We're here interpreting written description language. How do we do that? Right, Your Honor. Well, there's a few cases that I think give the answer to that that we cite in our brief. And what they hold is that when the specification's definition is not clear enough, or if the definition that would come from the specification is ambiguous, then one goes according to claim language, the ordinary meaning of the claim. And at least one of those is the Tether pharmaceutical case. There's another one that we cite for the same proposition. And I think that's the way the court would go here. Even aside from the meaning of derivatives, why don't you lose on equivalence? It says pentatate was a structurally similar compound. It has the multiple acetic acids. It's basically a chelating agent. It has this antibacterial activity and same functional way result. Why isn't it equivalent? Well, there's two points, Your Honor. And that was a fact. Fact finding. And there's two answers to that, or two responses to Your Honor's question. The first question is, in light of the claim language, the specification, and the prosecution history, is it legally permissible that editate by equivalence can reach other polyamino carboxylates? In other words, the case we cite for this is the ITC Tanabe case. Is it simply too narrow under the doctrine of narrow claiming to allow it reaching equivalence? And that, we submit, is a legal question. And I'll address each of these points. So that's one question to ask. The second question to ask— Infringement is a legal question? Well, no. The test standards and limitations on the doctrine of equivalence is a legal question. And that's stated in a number of the court's decisions that we cite. But the court went on and dealt with those limitations, found there was no prosecution history estoppel. And even if there was, there was an unforeseeability component that would rebut it. He dealt with every step of the process rather commendably. Well, we don't argue prosecution history estoppel. And AstraZeneca spends a lot of time in its briefs negating a prosecution history estoppel argument. Well, what is it you argue on the doctrine of equivalence issue? It's somehow—what? Well, there's two questions to be asked, two arguments we make. One is, is it legally possible that Editate can reach, by equivalence, other polyamino carboxylates like Pentatate? That's question one. Why not? Why not legally? As our presiding judge said, that's an infringement question, factual. Well, there are constraints on the doctrine of equivalence. And what's the constraint that prohibits it? Well, the constraint is if the claim is specifically claimed narrowly, such that a competitor reviewing the file, rather, would conclude that the applicants— The vitiation doctrine? Is that what you're trying to invoke here? It's really, I would say, it's better called the narrow claiming doctrine, the inherently narrow claim. Well, aren't you wiping out equivalence then? Aren't you wiping out the whole concept of equivalence? No, Your Honor. And the cases say that not all claim limitations are entitled to the same scope of equivalence. There's some that have potentially a wider scope of equivalence. There's some that have a narrower scope of equivalence. But in this case, the court, after an 11-day bench trial, looks at the term editate, which in the specification includes its derivatives, finds that these things perform the same function in the same way, chelating the metal ions, and makes each finding appropriately. I'm struggling to find your argument that this limitation doesn't deserve an equivalent. Well, let me, by example, look at the facts, with Your Honor, of the Tanabe case, where there were a number of limitations in the claim that were written in genus form. Lower alkyl, for example. Well, there was another limitation that was written as a specific compound, which was acetone. And the ITC asked, is it possible that butanone, which is a homologous one extra in the chain, is equivalent to acetone? And they found, in light of the way it was claimed, in light of the fact that that was the only example, that otherwise they used generic claims, and that they could have used a generic claim for that. They could have used ketone. And looking at the arguments that were made during prosecution, that a reasonable competitor, viewing the photo album, would view butanone as... But in this case, none of that fits. They could not have known that there was a DPTA out there. As the trial court points out, that was unforeseeable at the time. They couldn't have broadened their claim. They claimed exactly what they could at the time. See, I don't... And why don't they get an equivalence beyond that, as appropriately found by the court? Well, they could have claimed it generically. They could have at least tried to claim it generically. They could have claimed the art-recognized genus of which etatate is a member. They could have claimed polyamino carboxylates. Clear, structural, art-recognized genus. Or they could have claimed... Then we would have nailed them for a lack of written description to support the entire breadth of the claim, right? And we would have invalidated them. Well, if it was an original claim, no, I don't think so. But that doesn't mean... Just because a specification is written in such a way that a broader claim is not supported, that doesn't mean that the applicant is necessarily entitled to capture what he did not support by equivalence. He's not legally prohibited. Is it your argument that the use of the term etatate is not a structural description? Is that a term? Is that what you're saying? To the contrary, Your Honor, I think it's a clear structural term. Oh. That it has very specific... You're just saying it's narrow. Yes, Your Honor, that's right. It's limited to that structure. Perhaps I could move on to the second... Is this a characteristic of chemical patents as distinct from others? That is, are you suggesting that in the area of chemical patents there may be the need for a differentiation between how we see doctrine of equivalence cases there as distinct from mechanical or electrical cases? Are you implying or about to expressly say that? No, I don't think so. I have not thought about that, Your Honor, but this certainly could come up in other contexts. If someone, I'm just thinking about in a mechanical case, uses the term fastener, that's generic, and that would probably cover actually some sort of disclaimer. But if it used the term screw or screw and somebody came up and said, let's use a nut and bolt, are you suggesting that we would say, uh-uh, that's not an equivalent? How about let's say they came up and used a rivet? Let's move it a little farther away. I think in certain circumstances, if the specification and the prosecution are written in such a way that what is called out as the invention is the use of a screw, that's what's called out as the invention. That is the specific point of novelty. That is what is argued during prosecution. It's always screw, screw, screw. It's never fastener. Then I think we could have a situation where rivet might not be legally available by all means. But let me move on, if I could, to the second point that I wanted to make, which is even if it is legally possible to embrace other polyamino carboxylates, calcium, trisodium, pentatate by equivalence, is the evidence there in this case to support the district court's fact findings? And that, of course, is reviewed for clear error. The Supreme Court has said definite and firm conviction the mistake has been made. Well, we've got Dr. Keeley, we've got Dr. George, we've got Dr. Knapp saying that this is performing as a metal ion chelator. The same way. And the question is whether that's sufficient. The evidence that you are pointing to is in the record. The question is whether it's sufficient to carry the burden, particularly of weather. And I think the Keeley report... Remember, we have to find that the error is clear. Yes, Your Honor. And I think if the evidence is insufficient, if there is no particularized testimony, if there is no linking argument, if something is missing, then I think that is a clear error. What's missing? Well, what's missing is that the calcium trisodium pentatate and the editate kill the broad spectrum of microorganisms that are referred to here the same way by chelation. Are they both antimicrobials in this formulation? Yes, they are. Are they both known to be metal ion chelators? Yes, they are. I think viewing the evidence most favorably for the patentee, one could come away and say, there is evidence that in many cases metal ion chelators are bacteriostatic by virtue of their metal ion chelation. That doesn't mean that AstraZeneca proved that with respect to the organisms identified in the claims, gram-negative, gram-positive, and yeast, that these particular metal ion chelators work the same way with respect to each of those organisms. And AstraZeneca emphasized during prosecution that the invention was killing a broad spectrum of pathogens. Not just sometimes, but a broad spectrum. Are you saying that the DTPA was not shown to prevent more than a tenfold increase in staph, coli, pseudomonas, and candida? No, Your Honor, it was shown to do that. The question is, was it shown to do that the same way as disodium medicated? And I think the evidence does not show that. If we look, for example, at the Kili report... It depends upon how broadly we construe that way. If we say the way is simply metal ion chelation, it does it. If we require it to hit the exact same spectrum of microbial agents, perhaps you have a better argument. On the second point of Your Honor's question, I agree. Clearly, if you require more particular, that it chelates, for example, the same metal ions with respect to all of these, our argument is stronger. But I don't agree with Your Honor's premise of the first point, which is, if we look at it more broadly, that there is evidence. There is no evidence with respect to EDTA itself that it kills all of these organisms by chelation. And if we look at the Kili report, that is the prime piece of evidence, really, that AstraZeneca comes back to over and over again. That's in the record at page 1907 of the report. Well, it was submitted in response to the FDA's question about fetal toxicity. The entire document is about fetal toxicity and toxicity of calcium trisodium EDTA, references, evidence, with support. The reference that they rely on is a statement in the introduction. It says, it is effective in this regard, says it contains calcium DTPA as a microbial inhibitor. It is effective in this regard as a result of its ability to chelate divalent metal ions that are essential for many biological processes. Well, it doesn't say that it kills yeast that way. It doesn't say that it kills both gram-negative and positive that way. And it certainly doesn't establish that EDTA works that way. But when one looks at the record as a whole and asks, is this sufficient evidence? It is some evidence. But is it sufficient evidence to carry the burden of way? I'm not sure of equivalence. I don't think so. Your red light is on. You've consumed your time. But we've asked you a lot of questions. So we'll give you your three minutes back. Ms. Lauren. Thank you. Sure. May I please report? The district court, moving on to doctrine of equivalence, the district court found findings of fact that calcium trisodium DTPA functioned in the same way to achieve the same result as EDTA. And it did so based on the evidence in the record. But it was clearly erroneous to find that it's an equivalent or that it's a derivative. In fact, that's an incorrect claim construction because it's not a derivative. I mean, how do you get from EDTA to DPTA? Simply moving things around on a blackboard doesn't make it a derivative. Well, Your Honor, the derivative issue, getting back to literal infringement, the district court construed EDTA based on the meaning of derivative that it ascertained from the patent specification and not from a chemical or plain meaning of derivative. But what do you read in the specification that would allow you to so broadly read the word derivative? Well, Your Honor, the patent refers to... It only talks about editates as derivatives. But it refers to silicone derivatives including dimethicone and simethicone. Not in the definition of editate. Your Honor, it's using the word derivative in precisely the same way when it speaks about silicone as it is when it speaks about editate. And that is to describe a chemical relationship, a structural relationship between compounds. Dimethicone and simethicone are derivatives of silicone, which is not a specific compound. It's a family of compounds in the same way that DTPA is a derivative, calcium trisodium DTPA is a derivative of EDTA. That is a structural analog. But that's dealing with silicones. I mean, here we have an express definition of editate and derivatives thereof. And then it gives further examples, and all of them are salts of editate. So don't we have to focus on that rather than scrape something up from an entirely different class of compounds and read that into the definition of editate? Well, I think we have to focus on both, Your Honor. If we focus on column 4 in the passage that you pointed out, it says, for example, the calcium, the disodium editate is a derivative. It also says the nature of the editate is not critical, provided that the editate performs the function of retarding microbial growth. And then you look, okay, what did the patentees mean by the word derivative? Well, how did they use derivative elsewhere in the patent? That is precisely what Your Honors have instructed us to do when construing claims. Look at the claim language in the context of the patent. And clearly that's what the district court did and found that derivative was also used in the patent to refer to structural analogs and families of compounds. Mr. Loring, you started your argument at a point where I'd like to take you back to now because I think that's, for me at least, the tougher issue is the doctrine of equivalence problem. And you started talking about function, way, result. In order to make function, way, result fit, you really, to this kind of a case, you really have to sort of mush them together. There isn't a clear line between which is the way and which is the function. It's clear that what we're trying to do is to create a preservative for this chemical. There may be different ways of doing it, but they came up with a different preservative, didn't they? Well, Your Honor, the AstraZeneca patent listed the preservatives that the inventors tried or considered and discarded. Among those was sodium metabisulfite, benzyl alcohol. P.S., and by the way, there are generics on the market today that use sodium metabisulfite, that use benzyl alcohol. They did not. They did not infringe those patents. We did not sue them. However, DTPA, calcium trisodium DTPA, is by main zone admission structurally similar to EDTA. It's part of the same family. It's a metal ion chelator. It has the properties of the AstraZeneca invention, and that is adding a small amount of an antimicrobial that will go into the aqueous phase, because it's charged, that will not disrupt the emulsion, and that will retard microorganisms for up to 24 hours. The difference between calcium trisodium DTPA and EDTA is insubstantial. Then you look at the function-way result. Function-result were conceded. It functions as an antimicrobial, calcium trisodium DTPA, and it passes the microbiological test in the patent. Then we look at way, and I agree with Your Honor, you have to look at them together. Well, Maine admitted in its papers to the FDA that calcium trisodium DTPA functions as an antimicrobial by retarding microorganisms that, I'm sorry, by chelating the metal ions that microorganisms need to grow, and that's at page A1907. Maine also told the FDA that calcium trisodium DTPA is believed to behave in a similar manner to EDTA. The experts did not dispute that they're both metal ion chelators and that they are of similar structure. I can't imagine a more equivalent case, and I agree with what one of Your Honors said, that if you try to limit the document of equivalence so that it doesn't encompass compounds that were unforeseeable at the time that the patent application was filed, you are totally vitiating the document. Is there any way that one could draft a claim without getting into prosecution history or stop on all those problems? Is there any way you could draft a claim to be sufficiently precise so that you could actually say there are no legitimate equivalents available? For example, the screw case. Could you draft a mechanical claim that was so focused on the use of the screw as the invention, the creative idea, that somebody who came along with a rivet would be free to design around the screw case? Is that feasible? Can you do that? I think I'm going to try to answer your question in a slightly different way because I think that this is the Tanabe Seiyaku case, and I think you have to look not only at the specific claim language but the patent specification. And the Tanabe case is very different from our case because in that case there was a solvent-base pair that was claimed. The base was described in the patent in terms of family of compounds. The solvent was described in terms of acetone. And that difference in description was used as a basis to say, well, a skilled person reading this would understand that when you said just acetone, you meant just acetone. Did we affirm or reverse in the Tanabe case? I'm sorry? Did we affirm or reverse the lower court? I believe it was an affirmance. So that there's a standard of review issue there which favors you here, at least. Well, it favors you. And I think that's right because the district court made fact findings on equivalence. In this case, though, there was no way to draft a claim that would have captured DPTA because it wasn't knowable at the time, right? Well, and I think that raises an important point also about what the prior art showed and whether or not AstraZeneca's use of editating the prosecution history was in any way a disclaimer or a disavowal of DTPA. The prior art showed that both DTPA and EDTA were not broad-spectrum antimicrobials. Is that true? Were not. Is that true? True, yes. Are you saying true? I wasn't sneezing. Are you asking, is that T-R-U-E? C-H-E-W. C-H-E-W. So in a sense, it wasn't unforeseeable. There was a kind of equivalence in the prior art, wasn't there? I'm sorry. Wasn't DTPA shown to be similar to EDTA in terms of its antimicrobial activity? No, Your Honor. In fact, the prior art showed that one of them worked against grand negatives and the other didn't, and that's true. So you're saying there was an unforeseeability. There was, and the district court found that it was unforeseeable. And it was found by the district court. And so to list the specific editates or polyphenolcarboxylic acids in the specification would have been impossible at the time the application was filed. In fact, surprisingly, EDTA, calcium trisodium DTPA, both have broad-spectrum antimicrobial activity. Both can be added in a small amount without disrupting the emulsion. And both perform the same function. Now, in terms of literal infringement, the district court also found that calcium trisodium DTPA was an editate based on the evidence of records. Which was? You can find it. I'll tell you. The court found that DTPA and EDTA were structurally related based on the testimony of both means and AstraZeneca's experts that they were structural analogs. And this is all, by the way, at A51 to 54 of the district court's decision. The district court then found that calcium trisodium DTPA is structurally related to DTPA. It's a salt of DTPA. Does that make it a derivative? It is a derivative. How was one derived from the other? Calcium trisodium DTPA is a salt. It's a synthetic derivative of DTPA. And that was based on the testimony of Maine's experts. Normally a derivative is a minor modification of an existing compound, like an ethyl ester of an acid. I mean, that's a derivative. This is quite different. It's got two ethylene groups instead of three. It's got three amino groups instead of two. It's got five acetic acid groups. Does the record show that DPTA was derived from, in other words, convertible from EDTA? EDTA? No, Your Honor. The court's construction, the court's finding that DTPA is a derivative of EDTA, which was the first step in this three-step analysis, was based on the fact that they're structural analogs, not based on the fact that they're synthetic derivatives. That's not a proper use.  Not based on a synthetic derivative, Your Honor. But the district court found. Not based on a synthetic. In other words. What kind of derivative is that? Well, Your Honor, it's structural analogs, I expect. But the structural analog just is a statement of fact that they belong in some larger family of carboxylic acids, right? That's correct. And isn't that family potentially infinite? I mean, you could always tack on another amino or carboxylic acid. And the family is so vast as to make that definition of structurally related meaningless, isn't it? Well, Your Honor, I think in terms of going back now to the claim term EDTA, first of all, I don't know in the real world how many actual members of a polyamino carboxylic family there are. But that's not the end of the inquiry. You start out with compounds that are structurally related, either synthetic derivatives or structural analogs. And then you go to the second question, which is, does that compound retard the growth of microorganisms for at least 24 hours? A compound is not an EDTA unless it meets both of those tests of the district court. Now, in other words, you're using function now to define the structure? That is the way the patent. No, no, no. You're going to define what constitutes an EDTA. The structure is one piece of it. The function is the second piece. It must perform the function of retarding microbial growth in order to be an EDTA. And that is the statement in the patent that the district court pointed to. The nature of the EDTA is not critical, provided that it is able to retard microbial growth for at least 24 hours. And the court looked at that and said, there's a clear indication by the inventors that they intended to encompass editates that could retard microbial growth, and not just disodium editate. My time is up. But they still had to be editates. They still had to be editates, yes. Thank you. You've edified us on editates. Thank you, Ms. Lauren. Mr. Weiss, you did use up your time. But if you have some rebuttal concerning what Ms. Lauren stated, take a couple of minutes. Thank you, Your Honor. What I'd really like to do is to go back to the point. Not new issues, but rebuttal. I think this is rebuttal. It's the issue of interchangeability that Your Honor is focused on. And Judge Reagan, you asked me that. And before they drafted a claim, you asked me before. When you look at prosecution history in style, Bethesda says that's critical. Because when you make a narrow amendment, you can't be charged with capturing something that was unforeseeable at the time. And so if it's unforeseeable, that can excuse you from catching it when you make a narrow amendment. And that can prevent prosecution history to stop it from attaching. But when one is just looking at is compound X equivalent to the claimed compound W, it's actually the opposite. And that's in the Supreme Court cases that we cited. That's in Warner-Jankinson. That's in Graver Tank. And that's in Gil v. Wells. All of those cases say that known interchangeability is an important objective factor in favor of equivalence. That's all over the Graver Tank case. That people who were welders knew of the equivalence between manganese and magnesium to using these flux compounds. That was cited with approval by the Supreme Court in Warner-Jankinson as being an objective condition that limits the potentially unconstrained reach of the doctrine of equivalence. So in this case, because we're not relying on prosecution history to stop it, the lack of known interchangeability, the unpredictability, the separate patentability as found by the PTO weighs heavily against a finding of equivalence under the Supreme Court precedent. Unless Your Honors have any other questions. So you take her argument and stand it on its head. Yes, Your Honor. We believe that the lack of known interchangeability under Supreme Court precedent mandates a finding of no equivalence. Thank you, Mr. Weiss. The case was well argued on both sides. We'll take it under advisement. The final court is adjourned. So that's a long one. 10 AM.